### In re Cathy M. POWERS, Debtor.

### Cathy M. Powers, Plaintiff,

### v.

### Southwest Student Services Corporation and United Student Aid Funds, Inc., Defendants.

Bankruptcy No. 98–50515.
Adversary No. 99–5001.

United States Bankruptcy Court,
W.D. Missouri,
St. Joseph Division.

July 14, 1999.

John L. Young, Princeton, MO, for plaintiff.

Mark J. Schultz, Kansas City, MO, for defendant.

### MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

Cathy M. Powers, the Debtor in these Chapter 7 proceedings, filed a Complaint seeking a discharge, on the basis of undue hardship, of a student loan which she ob-

tained in 1981 and which now has a balance owed of $9,791.42, plus accrued interest. United Student Aid Funds, Inc., ("USAF") the holder and guarantor of the student loan, opposed the discharge and filed a Counterclaim seeking judgment against Powers for the balance owed. For the reasons set out below, the Court finds that excepting the student loan from discharge would place an undue hardship on the Debtor and her two minor children and therefore will grant the Debtor a discharge on the basis of her Complaint and will deny United Student Aid Funds the relief requested in its Counterclaim.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. § § 1334(b), 157(a), and 157(b)(1). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

## FACTS

The facts in this case are largely undisputed. Powers obtained a student loan in the original amount of $2,500.00 to enable her to attend Platte Business College, a now-defunct business school in St. Joseph, Missouri. Powers's father, now deceased, co-signed the student loan. Powers believed that her father had paid the loan, because she was not contacted by anyone seeking payment of the loan from 1981 until 1994. At that time, she was contacted by Southwest Student Services Corporation, the entity servicing the loan, about repayment, and she signed a new, consolidated promissory note agreeing to repay a then-current loan balance of $7,776.19. Between 1994 and the filing of her Chapter 7 bankruptcy on June 17, 1998, Powers made 12 payments totaling $1,162.81 on the student loan, and also received five forbearances totaling approximately 27 months. Despite the payments made, the total amount owed on the loan was $9,791.42 as of April 16, 1999, and interest continues to accrue at the rate of $2.41 a day.

The Debtor has two children, a son 16 and a daughter 13. She was divorced from her husband, Richard Lee Powers, in July 1993. Richard Lee Powers was ordered to pay $225.00 per month in child support for the minor children but the records of the Grundy County Circuit Court reflect that Powers has received child support payments irregularly over the last six years. Powers testified that the child support payments from her ex-husband have been so sporadic that she cannot count on them. All payments received have been obtained by garnishment or other execution; the ex-husband has not made any voluntary payments. The last support payment she received was six months ago. Her husband has been in and out of jail and prison, and recently completed serving a 120–day "shock detention" sentence in state prison on a five-year sentence. Within weeks of being released from prison, he was jailed again.

Over the years, the Debtor has received various forms of public assistance—aid to families with dependent children (AFDC), Medicaid insurance for the children, child care reimbursement, and food stamps. However, she has not received any public assistance benefits since early 1997 and is not eligible to receive public assistance benefits now.

Powers works as an income maintenance caseworker for the Division of Family Services, a Missouri state agency. Her job is to help determine the eligibility of applicants for public assistance payments. Powers began working for the Division of Family Services in 1993, first as a volunteer and then as a probationary employee, in connection with a program designed to assist public assistance recipients in obtaining job skills and in obtaining employment that would enable them to avoid dependence on the welfare system. Powers successfully made that transition and has now advanced to her present position as a caseworker. However, Powers believes that her likelihood of further advancement is remote, because for the most part she

would have to have a four-year college degree to advance further in the organization.

When Powers filed her Chapter 7 bankruptcy, she was working as a secretary for the Division of Family Services with a gross salary of $1,376.00 per month and take-home pay of $1,169.06. She was promoted to the caseworker position in November 1998, and at that time her gross monthly pay was increased to $1,708.00, and her net pay increased to $1,311.07 per month. For all of 1998, Powers had wage income of $17,330.00, and she also received an earned income credit of $2,684.00. This enabled her to receive a federal tax refund of $2,813.00 for the 1998 tax year.

Powers testified that her current living expenses for herself and her two teenage children are as follows:

| | | |
|---|---|---:|
| Rent or home mortgage payment | | $250.00 |
| Utilities: | Electricity and heating fuel | 200.00 |
| | Water and sewer | 100.00 |
| | Telephone | 80.00 |
| | Other | 39.43 |
| Food | | 433.00 |
| Clothing | | 75.00 |
| Laundry and dry cleaning | | 30.00 |
| Medical and dental expenses | | 35.00 |
| Transportation (not including car payments) | | 60.00 |
| Insurance: Health (children) | | 46.45 |
| | | $1,348.88 |

The Debtor is 37 years old and is in generally good health. Although she listed only $35.00 a month for medical and dental expenses, the Debtor testified that she takes blood pressure medication and her daughter also requires monthly medication, and all three family members require glasses and contact lenses costing more than $500.00 a year. Powers has contributed $25.00 a month of her income toward a deferred compensation program offered by the State of Missouri, under which the State matches the employee's contribution to the plan. Assuming such contributions have been made for a full six years, Powers would have contributed $1,800.00 to the deferred compensation program. Powers testified that she wants her children to go to college, but has not saved any money for their college expenses and presently would be unable to afford to send them to college unless she takes a second job, which she indicated she would be willing to do.

## DISCUSSION

Section 523(a)(8) of the Bankruptcy Code (11 U.S.C. § 523(a)(8)) provides that educational or student loans are excepted from the general discharge provisions of the Code "unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). There is no dispute that the consolidated loan now held by USAF is an educational loan that falls within the coverage of this provision. Since "undue hardship" is not defined in the Code, it is left to the bankruptcy courts to determine, on a case-by-case basis, whether the facts warrant a discharge of the student loan debt. *In re Rose*, 215 B.R. 755, 763 (Bankr. W.D.Mo.1997); *Andrews v. South Dakota Student Loan Assistance Corporation (In re Andrews)*, 661 F.2d 702, 704 (8th Cir. 1981). "The bankruptcy court must determine whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living." *In re Wegfehrt*, 10 B.R. 826, 830 (Bankr.N.D.Ohio 1981).

Although a number of differing tests have been developed by the courts over the last two decades to be used in determining the existence of undue hardship in these student loan cases,[1] the test that applies in the Eighth Circuit is the "totality of the circumstances test" enunciated in *Andrews v. South Dakota Student Loan Assistance Corporation (In re Andrews)*, 661 F.2d 702 (8th Cir.1981). *An-*

---

1. It has been said that there "are as many factors and tests which have been used to determine undue hardship as there are courts to decide the issue." *In re Johnson*, 121 B.R. 91, 93 (Bankr.N.D.Okla.1990). With this the Court wholeheartedly agrees.

dresen v. Nebraska Student Loan Program, Inc. (In re Andresen), 232 B.R. 127 (8th Cir. BAP 1999). The totality of the circumstances test established by *Andrews* requires an analysis of (1) the debtor's past, present, and reasonably reliable future financial resources, (2) calculation of the debtor's and his or her dependents' reasonable necessary living expenses, and (3) any other relevant facts and circumstances surrounding the particular bankruptcy case. *Andresen*, at 140. The Court will now turn to an analysis of the evidence in this case, applying the factors in the *Andrews* test.[2]

### 1. The Debtor's current and future financial resources

■ Under *Andrews*, the first analysis required is an analysis of the debtor's past, present and reasonably reliable future financial resources.

Between 1993 and 1998, the Debtor progressed from a probationary employee clerical position with the Division of Family Services to a position as an income maintenance caseworker. During that time, her income has increased from $7,358.67 in 1993 to $17,636.88 in 1998. With the pay increase she received in November 1998 as a result of her promotion to the position of caseworker, it appears that the Debtor will earn a gross salary of $20,496.00 in 1999. Obviously, Powers has experienced some substantial growth in her earned income in the recent past. However, it appears that Powers has reached the pinnacle of her earning power, inasmuch as her opportunities for advancement within the state agency are limited. Without a four-year college degree, it is unlikely that the Debtor will be able to advance further in her job. The Debtor attended one semester of college at North Central Missouri College in 1993, but was unable to continue because of her marital and family situation, and she testified that she would not be able to return to college at this time and obtain a degree because of her responsibilities as a parent of two teenage children. Historically, state employees in Missouri have received rather minimal annual pay increases (if any pay increases are received at all) in the range of 2% to 4% annually. In some years, increases are not provided at all. The Court believes it likely that the Debtor will receive no more than minimal cost-of-living pay increases for the foreseeable future.

■ The Defendants argue that "it is possible" for the Debtor to advance further in her employment with the Division of Family Services because the Debtor testified that an advanced degree was not required for a supervisor's position. It is also possible, however, that the Debtor will *not* be able to advance to a supervisory position. Either possibility involves almost total speculation. In contrast, the first prong of the *Andrews* test requires the Court to determine and consider the Debtor's "reasonably reliable future financial resources." The only "reasonably reliable future financial resources" the Court can foresee for the Debtor in this case are the rather minimal annual pay increases given to all state employees, and those increases generally are designed to do nothing more than keep up with inflation. Anticipating anything more than this would be sheer speculation.

### 2. The Debtor's necessary reasonable living expenses

The second prong of the *Andrews* test requires calculation of the Debtor's and her dependents' reasonable necessary living expenses.

---

2. For several years, many bankruptcy courts in the Eighth Circuit followed the test developed by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2nd Cir.1987). However, in the *Andresen* case, the Eighth Circuit BAP determined that the "totality of the circumstances" test established by the Eighth Circuit in the *Andrews* case should be used by the bankruptcy courts in this Circuit. Regardless of which test is applied in this case, the result would be the same.

The Court has set out above the current living expenses for the Debtor and her two teenaged children. The Court does not find any of these living expenses unreasonable or excessive, and in fact believes that several of the expenses are underestimated. For one example, the Debtor lists only $35.00 per month for medical expenses not covered by insurance, but she testified that both she and her daughter require regular medication and all three family members require glasses and contact lenses which cost more than $500.00 a year. These medications and eyewear would easily average $50.00 per month. Secondly, the Debtor has budgeted only $60.00 per month for auto expense, although she drives approximately 45 miles per day to and from her work location. She has allowed nothing for car repairs, although she is driving a 1991 automobile with more than 140,000 miles on it. At the time of filing the bankruptcy petition, the Debtor was making monthly car payments of $145.52. The car loan has now been paid off, but it is likely that she will very shortly have to purchase another automobile. It is unlikely that her monthly payments will be any less than $145.00 and, more likely, they will be substantially higher than that. As a final example, the Court notes that the Debtor has allowed only $100.00 per week for food for a family of three and $75.00 a month for clothing. The Court believes both of these amounts are underestimated, and knows from personal experience that it is extremely difficult to clothe two teenage children for $75.00 per month. Also, no allowance has been made for the children's school expenses (such as lunches, books, supplies and extracurricular activities) or for even a minimal amount of recreation.

The Debtor's amended schedules show current net income of $1,311.07 and necessary living expenses of $1,348.88. Therefore, the Debtor has no disposable income on a monthly basis with which to make any payments on the student loan debt.

Counsel for the Defendants emphasized at trial and in his post-trial brief that the Debtor could apply her federal income tax refunds in future years to repayment of her student loan debt. Counsel noted that the Debtor has received federal tax refunds of more than $2,700.00 in each of the last three years, which is the equivalent of approximately $230.00 per month.[3] While it is tempting to consider the prospect of a substantial federal income tax refund each year that could be used to pay the student loan, the Court believes that the tax refund cannot be relied upon in future years for that purpose. There is no assurance that the Debtor will continue to be eligible for an earned income credit, and that is the primary reason she received such a substantial tax refund for 1998. In fact, the Court believes that the amount of the earned income credit will decrease substantially as a result of the Debtor's higher income as a caseworker. Moreover, a tax refund is not received on a monthly basis and therefore is not available to enable the Debtor to make some kind of regular payments on the student loan. Finally, the Court is convinced that the income tax refund, in whatever amount, is necessary to enable the Debtor to pay the reasonable and necessary living expenses for herself and her two children, such as purchasing school clothing, paying for auto repairs, and other similar essentials.

The Court would also note that the Debtor's income does not allow her to make any provisions for college costs for her children, unless she is willing to withdraw money that she has set aside in the State's deferred compensation program or she takes a second job. Even the amount she has set aside in the deferred compensation program, at the rate of $25.00 a month, would be insufficient to pay any substantial amount of college expenses.

---

**3.** The Debtor testified that she used $1,200.00 of the 1998 tax refund to enable her 16–year-old son to obtain an automobile so he could have transportation to a part-time job, and that the balance of the refund was used to pay household bills and expenses.

In summary, the Court believes that the expenses claimed by the Debtor are reasonable and necessary for her and her children's support. The Court does not find anything extravagant or wasteful in the expenses, but on the contrary believes that the expenses are minimal and, in all likelihood, are understated. The Debtor has no disposable income with which to make even minimal payments on the student loan.

### 3. Other unique circumstances in this particular case

■ The final prong of the *Andrews* test is a consideration of other relevant facts and circumstances that are present in the particular bankruptcy case before the court. Some of the case-specific "unique" factors that have been considered by the courts have included: illness in the debtor's family; incapacity; good faith efforts to pay; whether the hardship in paying the loan would be long term; the debtor's status according to poverty guidelines; time spans between graduation, maturation of the loan and the filed petition; excess income in the debtor's budget; reaffirmation agreements entered into, if any; and the ratio of the student loan to the total indebtedness. *In re Johnson*, 121 B.R. at 93. These factors, of course, are neither all-inclusive nor exclusive, but rather are illustrative of the sorts of things the courts have considered in the absence of statutory definitions of "undue hardship" and "minimal standard of living." Some of these unique factors are found in the present case.

First, we believe the Debtor made a good faith attempt to repay a debt that she firmly believed had been satisfied many years ago. The Debtor obviously believed that her late father had paid the student loan debt, particularly since the Debtor had not been contacted concerning repayment from 1981 through 1993. It was only in 1994 that she learned, much to her chagrin, that the student loan had not been paid and that she was expected to

pay it. Instead of stonewalling the creditor, Powers entered into a new promissory note for payment of the student loan, and over the course of the last several years has made payments totaling $1,162.81. Those payments were made despite the nearly total lack of support she received from her ex-husband for the family's living expenses. Furthermore, the Court believes that the Defendants must bear a significant share of the blame for the Debtor's and the Defendants' present predicament. From 1981 until 1994, a period of 13 years, no apparent effort was made to collect the amount owed from the Debtor or her father, a co-signer on the loan. The Defendants offered no evidence that they attempted to collect the debt from the father or that they filed a claim against his estate. A diligent and prompt collection effort by the entity servicing the loan probably would have avoided the present situation. Instead, a manageable $2,500.00 loan has grown to more than $9,700.00, an amount the Debtor is unable to pay without undue hardship.

The Defendants' primary argument seems to be that the Debtor does not have to have $1,311.07 of net income a month in order to maintain a minimal standard of living for herself and her two teenage children. Defendants' counsel argues that, at the time of the bankruptcy filing in June 1998, the Debtor's living expenses were only $977.43 a month, if one excludes the Debtor's car payment of $145.52 a month (since the car payments have now ended) and an allegedly duplicate insurance expense of $46.45 a month (which the Court is not convinced was actually a duplication; that was never made clear). This argument ignores reality. The Debtor cannot be expected to drive indefinitely a 1991 vehicle with over 140,000 miles on it; it will have to be replaced soon, more than likely, or the Debtor will have major repair bills. Moreover, the Debtor's expense schedule lists nothing for auto insurance, so it appears the Debtor is driving without even the minimum of state-mandated in-

surance. Section 303.025, RSMo 1996. As noted earlier, the Debtor's budget provides only $60.00 a month for auto expense, despite the age of the Debtor's car and the distances driven to and from work each day.

Another factor that may be considered is whether the Debtor has entered into numerous reaffirmation agreements which might indicate an intention to hold onto consumer goods (such as televisions, stereos, and appliances) at the expense of the student loan creditor. That has not occurred in this case. The Debtor entered into only one reaffirmation agreement, and that was with the Farmers Bank of Northern Missouri, N.A., on her automobile. That agreement reaffirmed a debt of $1,745.91 which has now been paid in full, with monthly payments of $160.52. Therefore, it does not appear that Powers is attempting to retain any major "luxury" items and pay for them with money that could otherwise go to the Defendants.

■ In this case, the Debtor has argued that she has received no economic or educational benefit from her student loan because the school closed many years ago, the credits earned there were not transferrable to another school, and the Debtor did not obtain any skills that helped her obtain gainful employment. An argument—albeit a weak one—could be made that Congress intended the economic or educational utility of the education received to be a factor to be considered in determining dischargeability on undue hardship grounds. In supporting the undue hardship provision in § 523(a)(8), the Commission on the Bankruptcy Laws of the United States, which drafted the provision, stated:

> "[A] loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt. *Report of the Commission on the Bankruptcy Laws of the United States*, House Doc. No. 93–137, Part I, 93rd Cong., 1st Sess. (1973) at 140, n. 14 and 15."

*In re Johnson*, 121 B.R. at 93. The Court does not believe that, in adopting the undue hardship provision, the Congress intended to tie a student loan discharge to the economic or educational utility of the education received. There is never any guarantee that a student will utilize his or her education to obtain employment that could not have been obtained without that education. Besides, if a debtor should claim that the education proved to be of no value, it would be virtually impossible for the student loan creditor to prove otherwise. Accordingly, the Court will not, in this case or in future cases, give any weight to such an argument.

The Court has considered the cases cited by the Defendants in their post-trial brief. The cases are factually distinct from the present case, but the Court has carefully considered the legal arguments.

In summary, the Court is impressed in this case that the Debtor has overcome some rather substantial obstacles to reach a point where she is able, by virtue of her own efforts and without outside assistance, to provide a minimally reasonable standard of living for herself and her two children. She has worked her way off the public assistance rolls, starting from a probationary employee status and progressing to a position as a caseworker, again as a result of her own determined efforts. The Debtor is to be commended for the progress she has made.

## CONCLUSION

Upon consideration of all of the evidence in this case, the Court finds and concludes that it would work an undue hardship on the Debtor and her dependents to except the Debtor's student loan from discharge. The purpose of the bankruptcy discharge is to give honest and deserving debtors a fresh start in their financial lives. The Court believes that the Debtor in this case

**902**

would be deprived of that fresh start if the student loan debt owed to United Student Aid Funds is not discharged. Therefore, it is

**ORDERED** that the Debtor's Complaint to Determine Dischargeability be and is hereby GRANTED, and the Debtor is hereby granted a discharge of the student loan debt owed to United Student Aid Funds, Inc. It is

**FURTHER ORDERED** that the relief sought by United Student Aid Funds, Inc., in its counterclaim is DENIED.

The Clerk shall enter judgment in accordance with this opinion.

**SO ORDERED.**